**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| SANDRIDGE ENERGY, INC., *et al.*,[1] | § | Case No. 16-32488 (DRJ) |
| | § | |
| Debtors. | § | (Joint Administration Requested) |
| | § | (Emergency Hearing Requested) |

# DEBTORS' <u>EMERGENCY</u> MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS AUTHORIZING THE DEBTORS TO (I) PAY PREPETITION WAGES, SALARIES, OTHER COMPENSATION, AND REIMBURSABLE EXPENSES AND (II) CONTINUE EMPLOYEE BENEFITS PROGRAMS

**THIS MOTION SEEKS ENTRY OF AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.**

**EMERGENCY RELIEF HAS BEEN REQUESTED. IF THE COURT CONSIDERS THE MOTION ON AN EMERGENCY BASIS, THEN YOU WILL HAVE LESS THAN 21 DAYS TO ANSWER. IF YOU OBJECT TO THE REQUESTED RELIEF OR IF YOU BELIEVE THAT THE EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU SHOULD FILE AN IMMEDIATE RESPONSE. A HEARING WILL BE HELD ON THIS MATTER FOR MAY 18, 2016, AT 3:00 PM (CT) BEFORE THE HONORABLE DAVID R. JONES, 515 RUSK STREET, COURTROOM 400, HOUSTON, TEXAS 77002.**

**REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: SandRidge Energy, Inc. (4793); 4th Street Properties, LLC (N/A); Black Bayou Exploration, L.L.C. (0561); Braniff Restaurant Holdings, LLC (2453); CEBA Gathering, LLC (6478); CEBA Midstream GP, LLC (0511); CEBA Midstream, LP (7252); Cholla Pipeline, L.P. (5092); Cornhusker Energy, L.L.C. (4609); FAE Holdings 389322R, LLC (N/A); Integra Energy, L.L.C. (7527); Lariat Services, Inc. (0702); MidContinent Resources, LLC (6928); Mistmada Oil Company, Inc. (3032); Piñon Gathering Company, LLC (5943); Sabino Exploration, LLC (1929); Sagebrush Pipeline, LLC (0515); SandRidge CO2, LLC (7903); SandRidge Exploration and Production, LLC (6535); SandRidge Holdings, Inc. (8401); SandRidge Midstream, Inc. (1148); SandRidge Operating Company (1245); SandRidge Realty, LLC (6079); Sierra Madera CO2 Pipeline, LLC (1558); and WTO Gas Gathering Company, LLC (N/A). The location of the Debtors' service address is: 123 Robert S. Kerr Avenue, Oklahoma City, Oklahoma 73102.

The above-captioned debtors and debtors in possession (collectively, the "Debtors") respectfully state the following in support of this motion (this "Motion").

**Relief Requested**

1. The Debtors seek entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B** (respectively, the "Interim Order" and the "Final Order"), authorizing the Debtors to (a) pay all prepetition and postpetition obligations on account of the Employee Compensation and Benefits (as defined below) in the ordinary course of business and (b) continue to administer the Employee Compensation and Benefits, including payment of prepetition obligations related thereto. In addition, the Debtors request that the Court schedule a final hearing 21 days after the commencement of these chapter 11 cases to consider approval of this Motion on a final basis.

**Jurisdiction, Venue, and Procedural Background**

2. The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The bases for the relief requested herein are sections 105(a), 362(d), 363(b), and 507(a) of title 11 of the United States Code (the "Bankruptcy Code") and rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

4. On the date hereof (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. A detailed description surrounding the facts and circumstances of these chapter 11 cases is set forth in the *Declaration of Julian Bott, Chief Financial Officer of SandRidge Energy, Inc., in Support of Chapter 11 Petitions and First Day Motions*, filed contemporaneously with this Motion.

**The Debtors' Workforce**

5. The Debtors employ approximately 657 individuals on a full-time basis (the "Employees"). Approximately 267 Employees are paid on an hourly basis, and approximately 390 Employees earn a salary. The Employees are not represented by a collective bargaining unit. In addition to the Employees, the Debtors also periodically retain specialized individuals as independent contractors to complete discrete projects (the "Independent Contractors"), as well as temporary workers (the "Temporary Staff") sourced periodically from various staffing agencies (the "Staffing Agencies") to fulfill certain duties on a short-term basis. At this time, the Debtors retain approximately seven Independent Contractors and 10 Temporary Staff. The Independent Contractors and Temporary Staff are an important supplement to the efforts of the Debtors' Employees.

6. The Debtors' Employees, Temporary Workers, and Independent Contractors perform a wide variety of functions critical to the Debtors' operations. In many instances, these individuals are highly trained and have an essential working knowledge of the Debtors' business that cannot be easily replaced. Without the continued, uninterrupted services of their Employees, Temporary Workers, and Independent Contractors, the Debtors' reorganization efforts will be threatened.

## Employee Compensation and Benefits

7. The Debtors maintain the following compensation and benefits programs and pay various administrative fees and premiums in connection therewith (each as defined herein, and together, the "Employee Compensation and Benefits"):

- Employee Compensation;
- Independent Contractor Compensation;
- Temporary Staff Compensation;
- Deductions and Payroll Taxes;
- Reimbursable Expenses;
- Non-Insider Employee Incentive Programs;
- Health and Welfare Programs;
- Paid Leave and Unpaid Leave; and
- Non-Insider Severance Programs.

8. The vast majority of Employees rely exclusively on the Employee Compensation and Benefits to pay their daily living expenses and support their families. Thus, Employees will be exposed to significant financial constraints if the Debtors are not permitted to continue the Employee Compensation and Benefits in the ordinary course of business. Consequently, the relief requested is necessary and appropriate.

**I. Compensation and Withholding Obligations.**

**A. Unpaid Wages.**

9. The Debtors pay Employees' wages, salaries, and other compensation (excluding reimbursable expenses, severance, and paid leave) on a bi-weekly basis (collectively, the "Employee Compensation"). Because Employees are generally paid two pay periods in arrears, certain Employees will be owed accrued but unpaid Employee Compensation as of the

Petition Date. Employee Compensation may also be due and owing as of the Petition Date because of, among other things, potential discrepancies between the amounts paid and the amounts that Employees believe should have been paid, which, upon resolution, may reveal that additional amounts are owed to such Employees. In the 12 months before the Petition Date, the Debtors spent an average of approximately $8.3 million a month on Employee Compensation.

10. As of the Petition Date, the Debtors estimate that the amount of accrued but unpaid obligations owed to Employees is approximately $1.4 million on account of accrued Employee Compensation earned before the Petition Date. The Debtors do not believe any Employee is owed Employee Compensation in excess of $12,475.

**B. Independent Contractors and Temporary Staff Compensation.**

11. The Debtors make payments to Independent Contractors (the "Independent Contractor Compensation"), and Staffing Agencies on account of Temporary Staff (the "Temporary Staff Compensation"), for the performance of certain services critical to the Debtors' operations, including, among other things, administrative functions, like information technology and maintenance services, and operational functions related to the Debtors' oil and gas businesses. The Debtors' Employees rely on the support of Independent Contractors to complete discrete projects in furtherance of the Debtors' businesses and Temporary Staff to fill short-term positions that are not economically feasible to employ on a full- or part-time basis. The Debtors believe the authority to continue paying their Independent Contractors and the Staffing Agencies is critical to minimize disruption of the Debtors' continued business operations.

12. In the 12 months before the Petition Date, the Debtors spent approximately $1.7 million on Independent Contractors in the aggregate and $1.6 million on payments to the Staffing Agencies in the aggregate. As of the Petition Date, the Debtors estimate that

Independent Contractors are owed an aggregate of approximately $22,000 on account of accrued services rendered prior to the Petition Date, and the prepetition obligations owed to Staffing Agencies are estimated at approximately $45,000. The Debtors do not believe they owe any individual Independent Contractor or Temporary Staff amounts in excess of $12,475.

**C. Withholding Obligations.**

13. During each applicable pay period, the Debtors routinely deduct certain amounts from Employees' paychecks, including, without limitation, garnishments, levies, child support, and related fees, and pre-tax deductions payable pursuant to certain of the Health and Welfare Programs (as defined below) (collectively, the "Deductions"). Some of the Deductions are forwarded to various third-party recipients. In the 12 months before the Petition Date, monthly Deductions were approximately $1.4 million.

14. The Debtors also are required by law to withhold from the Employees' Compensation amounts related to, among other things, federal, state, and local income taxes as well as Social Security and Medicare taxes (collectively, the "Employee Payroll Taxes") for remittance to the appropriate federal, state, and local taxing authorities. The Debtors must then match the Employee Payroll Taxes from their own funds and pay, based upon a percentage of gross payroll, additional amounts for state and federal unemployment insurance (the "Employer Payroll Taxes," and together with the Employee Payroll Taxes, the "Payroll Taxes"). The Payroll Taxes are generally processed and forwarded to the appropriate federal, state, or local taxing authority at the same time Employees' payroll checks are disbursed. In the 12 months before the Petition Date, monthly Payroll Taxes were approximately $5 million.

15. As of the Petition Date, the Debtors estimate that the aggregate amount of accrued but unpaid Deductions and Payroll Taxes (together, the "Withholding Obligations") is approximately $601,500.

**D. Reimbursable Expenses.**

16. The Debtors reimburse Employees and members of the board of directors for certain expenses incurred in the scope of their duties (the "Reimbursable Expenses"). Reimbursable Expenses typically include expenses associated with transportation, lodging, and meals incurred in connection with business travel and certain other work-related expenses.

17. Certain Reimbursable Expenses are incurred through the use of personal funds, and the Employee or director may be held personally liable for any unpaid obligations. The Debtors' inability to reimburse such expenses would impose hardship on such individuals where the obligations were incurred for the Debtors' benefit.

18. In the 12 months before the Petition Date, monthly Reimbursable Expenses were approximately $114,000. As of the Petition Date, the Debtors estimate that the amount of accrued but unpaid Reimbursable Expenses is approximately $175,000.

**II. Non-Insider Employee Incentive Programs.**

19. The Debtors employ a number of incentive programs to drive performance among their Employees, including the Performance Incentive Program, the Referral Incentive Program, the Safety Incentive Program, the Service Award Program, and the Legacy Equity Incentive Program, and pay certain administrative fees to third-party providers associated with such programs (each as defined herein, and collectively, the "Non-Insider Employee Incentive Programs").[2]

---

[2] The relief sought under this Motion with respect to the Non-Insider Employee Incentive Programs does not include the payment of any obligation to an "insider" (as that term is defined in section 101(31) of the Bankruptcy Code, the "Insiders"). The Debtors will seek separate authority with respect to such parties and reserve all rights with respect to the "insider" status of such parties.

**A. Performance Incentive Program.**

20. All Employees are eligible to participate in a performance-based incentive program (the "Performance Incentive Program"). Under the program, the Debtors annually determine a set of performance benchmarks (the "Scorecard") and the target and maximum incentive payment for each Employee under the Performance Incentive Program. Awards under the Performance Incentive Program are calculated and paid in cash, up to the maximum incentive payment for each Employee, based on the Debtors' performance as measured against the Scorecard.

21. The Debtors believe the Performance Incentive Program is integral to the operation of the Debtors' business. In particular, the Performance Incentive Program aligns Employees' interests with those of the Debtors generally by linking payments under the Performance Incentive Program to performance and overall efficiency of the Debtors' operations.

22. The Debtors do not currently have any obligations to any Employees outstanding on account of the Performance Incentive Program. For the remainder of 2016, if each current non-Insider Employee received his or her target incentive payment, the Debtors would distribute a total of approximately $8.7 million under the Performance Incentive Program. If all non-Insider Employees received the maximum incentive payment, the total amount payable to non-Insider Employees under the Performance Incentive Program for the remainder of 2016 would be approximately $17.4 million.

**B. Referral Incentive Program.**

23. The Debtors provide cash incentives to current non-Insider Employees who refer candidates to fill identified vacant employment positions (the "Referral Incentive Program"). Under the Referral Incentive Program, a referring Employee will receive payment once a

referred candidate has completed 90 days of employment with the Debtors. In the 12 months before the Petition Date, the Debtors spent approximately $2,000 on account of the Referral Incentive Program. As of the Petition Date, the Debtors do not have any outstanding obligations on account the Referral Incentive Program.

**C. Safety Incentive Program.**

24. The Debtors provide cash incentives to current non-Insider Employees for achieving yearly milestones without an OSHA recordable safety incident (the "Safety Incentive Program"). Payments under the Safety Incentive Program are based on the Employees' position, and payments under the Safety Incentive Program are made as milestones are achieved. Employees who achieve one year without an incident receive a payment of $500–$1,000; Employees who achieve two years without an incident receive $1,000–$2,000; and Employees who achieve three years without an incident receive $1,500–$,3000. In the 12 months before the Petition Date, the Debtors paid approximately $39,000 on account of the Safety Incentive Program. As of the Petition Date, the Debtors estimate that the amount of accrued but unpaid obligations on account of the Safety Incentive Program is approximately $2,700.

**D. Service Award Program.**

25. The Debtors provide cash payments to Employees in recognition of their service at each five year anniversary of their employment (the "Service Award Program"). Payments under the Service Award Program are made quarterly and eligible Employees receive $100 for each year of service to the Debtors. In the 12 months before the Petition Date, the Debtors paid approximately $50,000 under the Service Award Program. As of the Petition Date, the Debtors estimate that the amount of accrued but unpaid obligations on account of the Service Award Program is $10,000.

**E. Legacy Equity Incentive Program.**

26. Under the Debtors' legacy equity incentive program, which is no longer in effect (the "Legacy Equity Incentive Program"), the Debtors issued shares of restricted common stock to Employees (the "Restricted Stock"). Although the Restricted Stock is already issued, it is held in an account with the Debtors' transfer agent until specified vesting dates, at which point it is transferred to the applicable Employee. The vesting of Restricted Stock involves no cash outlay. To maintain the continuity of compensation practices and avoid confusion among Employees, the Debtors believe it is important to allow the restricted stock to continue to vest in the ordinary course of business after the Petition Date. As of the Petition Date, the total Restricted Stock outstanding represents less than 2% of the Debtors' total outstanding common stock.

27. The Debtors contract with E*Trade Financial Corporation ("E*Trade") to administer the vesting of Restricted Stock. In the 12 months prior to the Petition Date, the Debtors paid E*Trade approximately $34,000. As of the Petition Date, the Debtors estimate that there are no accrued but unpaid obligations to E*Trade for administration of the Restricted Stock.

**III. Employee Benefit Programs.**

**A. Health and Welfare Programs.**

28. The Debtors offer a number of health and welfare benefits programs to eligible current and former Employees, including the Health Insurance Programs, the Life and AD&D Insurance, the Disability Benefits, the Workers' Compensation Program, the Retirement Plans, the Relocation Program, and the Assistance Programs, and pay certain administrative fees to third-party providers associated with such programs (each as defined herein, and collectively, the "Health and Welfare Programs").

**1. Health Insurance Programs.**

29. The Debtors offer their Employees the opportunity to participate in a number of health benefit plans, including the Medical Plans, the Stop-Loss Insurance, the Wellness Program, the HSA, the FSA, and the Vision Plans (each as defined herein, and collectively, the "Health Insurance Programs"). The Debtors also subsidize or continue to provide certain benefits to certain former Employees after their termination, retirement, or disability leave, including (without limitation) benefits provided under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA").

30. The Debtors offer medical, dental, and prescription drug benefit programs (the "Medical Plans") to current and certain former Employees, which are administered by BlueCross BlueShield of Texas ("BCBS") and OptumRX, respectively. The coverage in the Medical Plans differs depending on the level of coverage Employees or former Employees elect to receive. Monthly health care premiums differ depending on the Medical Plan in which the Employee or former Employee is enrolled and whether the Employee or former Employee has dependents covered by the applicable plan. While the Medical Plans are self-insured, the Debtors maintain a stop-loss insurance policy with BCBS to cover catastrophic medical claims (the "Stop-Loss Insurance"). The total cost of the Medical Plans, including the Stop-Loss Insurance, is approximately $1 million per month.

31. The Debtors also partner with Compass Professional Health Services ("Compass") to provide Employees with up to $750 in discounted medical premiums in 2017 if they complete certain health-related activities (the "Wellness Program"). The Debtors pay Compass approximately $5,000 per month in administrative fees related to the Wellness Program.

32. Employees who participate in certain of the Medical Plans may contribute a portion of their compensation into a health savings account (the "HSA"), administered by WageWorks, Inc., which may be used for incidental medical expenses. Participating Employees can make before-tax contributions to the HSA through payroll deductions to cover reimbursements under the program up to the maximum amount permitted by the IRS. Additionally, the Debtors provide a one-time contribution to each participating Employee's HSA in the amount of $500 per Employee. Currently, approximately 76 Employees and 89 former Employees use the HSA.

33. The Debtors also provide Employees who participate in certain of the Medical Plans with access to a flexible spending account (the "FSA"), administered by WageWorks, Inc., which can be used to cover incidental medical costs and dependent child care. Currently, approximately 158 Employees use the FSA for medical costs and 31 Employees use the FSA for dependent child care. The Debtors do not make any contributions to any Employee's FSA. The Debtors pay a monthly administration fee of approximately $1,800 to WageWorks on account of the HSA and FSA.

34. The Debtors also provide vision insurance through Superior Vision and Vision Service Plan (the "Vision Plan"). The Vision Plan is fully insured. The total cost of the Vision Plan is approximately $10,000 each month, which is funded entirely by Employee contributions and former Employee contributions.

35. The Debtors spend approximately $1 million per month on the Health Insurance Programs. Of this amount, approximately $900,000 per month (paid in arrears), including Employee and former Employee contributions, and $580,000 per month, excluding such contributions, relates to the costs of medical, prescription, and dental claims made by

Employees. As of the Petition Date, the Debtors estimate that the amount of accrued but unpaid obligations under the Health Insurance Programs is approximately $1.1 million.

**2. Insurance, Disability, and Workers' Compensation Programs.**

**a. Life and AD&D Insurance Programs.**

36. The Debtors provide life (the "Basic Life Insurance") and accidental death and dismemberment insurance coverage (the "Basic AD&D Insurance") to current and certain former Employees through StanCorp Financial Group, Inc. ("The Standard"), which each provide maximum coverage of $150,000 in the event of an Employee's death or dismemberment. Current and certain former Employees may also purchase voluntary life insurance (the "Voluntary Life Insurance") and voluntary accidental death and dismemberment insurance (the "Voluntary AD&D Insurance" and, together with the Basic Life Insurance, the Basic AD&D Insurance, and the Voluntary Life Insurance, the "Life and AD&D Insurance") covering themselves and their spouses and children, through The Standard. Employees are eligible for company sponsored Life and AD&D Insurance upon completion of a benefit eligibility waiting period, on the first of the month following two months of continuous employment. The Debtors are fully insured through the Life and AD&D Insurance.

37. In the 12 months before the Petition Date, the Debtors paid approximately $205,000 on account of their portion of the premiums for the Life and AD&D Insurance. As of the Petition Date, the Debtors estimate that the amount of accrued but unpaid obligations on account of the Life and AD&D Insurance is approximately $40,000.

**b. Disability Benefits.**

38. The Debtors provide Employees with short- and long-term disability benefits (the "Disability Benefits"). Employees are eligible for Disability Benefits upon completion of a benefit eligibility waiting period. Under the short-term disability benefits program, Employees

are entitled to, among other things, continuation of 60% of their base wages in the event of a short-term medical disability due to an illness, injury, or pregnancy related condition (the "Short-Term Disability Benefits"). Under the long-term disability benefits program, Employees are entitled to, among other things, continuation of 60% of their wages, up to a monthly limit of $10,000, in the event of a long-term medical disability due to illness or injury (the "Long-Term Disability Benefits" and, together with the Short-Term Disability Benefits, the "Disability Benefits").

39. Employees' Short-Term Disability Benefits begin after an Employee is continuously disabled for 15 days and continue for up to a maximum of 24 weeks. The Long-Term Disability Benefits begin after an Employee is continuously absent for 180 days and continue until the Employee no longer meets the eligibility criteria or has reached the maximum duration of benefits. Both the Short-Term Disability Benefits and the Long-Term Disability Benefits are fully insured and administered through Reliance Standard Insurance Company ("Reliance").

40. In the 12 months before the Petition Date, the Debtors paid an average of approximately $35,000 per month in administrative fees and premiums with respect to the Disability Benefits. As of the Petition Date, the Debtors estimate that the amount of accrued but unpaid obligations on account of the Disability Benefits is approximately $2,000.

**c. Workers' Compensation Program.**

41. The Debtors maintain workers' compensation insurance for Employees at the levels required by laws in the states in which the Debtors operate (collectively, the "Workers' Compensation Program"). All Employees participate in the Debtors' Workers' Compensation Program, which is fully insured. The Debtors maintain coverage for the Workers' Compensation Program through Liberty Mutual Group ("Liberty Mutual"). The Debtors pay approximately

$567,000 annually to Liberty Mutual for maintaining the Workers' Compensation Program. The Debtors also maintain reserves for claims under older policies administered by ACE Limited ("ACE") and American International Group, Inc. ("AIG"). Each of the Liberty Mutual, ACE, and AIG policies have deductibles that require the Debtors' to reimburse the applicable insurer for a portion of claims paid under the Workers' Compensation Program.

42. The Debtors must continue the claim assessment, determination, adjudication, and payment process pursuant to the Workers' Compensation Program without regard to whether such liabilities are outstanding before the Petition Date to ensure that the Debtors comply with applicable workers' compensation laws and requirements.[3] There are currently 43 open claims under the Workers' Compensation Program, of which 24 are covered by the Liberty Mutual policy, eight by the AIG policy, and 11 by the ACE policy. As of the Petition Date, the Debtors estimate that the aggregate amount of accrued but unpaid administrative fees and deductibles on account of the Workers' Compensation Program is approximately $2.2 million.

**3. Retirement Plans.**

43. The Debtors offer their Employees the opportunity to participate in a 401(k) Plan, including the 401(k) Contributions and the 401(k) Participant Loan Payments, and a Non-Qualified Plan, including the Non-Qualified Elections, the Non-Qualified Contributions, and the Non-Qualified Distributions (each as defined herein, and collectively, including the Retirement Plan Fees, the "Retirement Plans").

**a. 401(k) Plan.**

44. The Debtors provide all Employees with the opportunity to participate in a 401(k) program (the "401(k) Plan"). Employees age 21 or over become eligible for the 401(k) Plan on

[3] The Debtors' Workers' Compensation Program may change postpetition in the ordinary course of business due to changes in applicable laws and regulations and the Debtors' ability to meet requirements thereunder.

the first of the month following two months of continuous unemployment. The 401(k) Plan generally provides for pre-tax salary deductions of compensation up to limits set by the Internal Revenue Code. Each Employee's 401(k) contributions are deducted automatically from each paycheck. The Debtors match the Employees' 401(k) Plan contributions dollar-for-dollar in an amount up to 10% of the Employees' eligible compensation, plus certain discretionary contributions (the "401(k) Contributions"). Under the 401(k) Plan, the Debtors also make disbursements on account of payroll deductions for repayment of loans that Employees previously drew from their individual 401(k) accounts (the "401(k) Participant Loan Payments").

45. In the 12 months before the Petition Date, the Debtors' monthly payments and disbursements on account of 401(k) Contributions and 401(k) Participant Loan Payments averaged approximately $1.5 million. As of the Petition Date, the Debtors estimate that they owe approximately $100,000 on account of the 401(k) Plan, consisting entirely of the 401(k) Contribution obligations for the first quarter of 2016.

**b. Non-Qualified Plan.**

46. Employees whose base salary is equal to or greater than $175,000 are eligible to participate in an additional retirement plan (the "Non-Qualified Plan"). Under the Non-Qualified Plan, eligible Employees may defer up to 75% of their eligible salary and bonus pre-tax (the "Non-Qualified Elections"). The Employee's Non-Qualified Elections must match their 401(k) elections. Eligible Employees must max out the IRS limits on their 401(k) before contribution can be made to the Non-Qualified Plan. The Debtors match contributions to the Non-Qualified Plan dollar-for-dollar up to a maximum of 10% of the Employee's eligible compensation (the "Non-Qualified Contributions"). The Non-Qualified Contributions are made on a per pay period basis only after the Employee's contributions have been maxed out for the current year in the 401(k) Plan. Non-Qualified Plan assets are held in a separate "rabbi trust" to

pay benefits. The Debtors make cash distributions from the Non-Qualified Plan to former Employees in the ordinary course of business (the "Non-Qualified Distributions"). There are 37 Employee participants in the Non-Qualified Plan, who have made Non-Qualified Elections and on account of whom the Debtors make Non-Qualified Contributions, and 12 former Employee participants in the Non-Qualified Plan, who periodically receive Non-Qualified Distributions from the Debtors.

47. In the 12 months before the Petition Date, the Debtors' quarterly Non-Qualified Contributions averaged approximately $225,000 and the Debtors' annual Non-Qualified Distributions were approximately $7.2 million. As of the Petition Date, the Non-Qualified Plan balance is approximately $6.7 million. Accordingly, as of the Petition Date, the aggregate amount of accrued but unpaid Non-Qualified Distributions is approximately $6.7 million. This amount, however, is not a current cash payment obligation, as Employees are only entitled to cash payment of Non-Qualified Distributions in the event the Employees leave the Debtors' employment.

**c. Retirement Plan Fees.**

48. The Retirement Plans are administered by Reliance (as trustee) and the Newport Group (as record keeper), to which the Debtors pay quarterly administrative fees of approximately $87,000 (the "Retirement Plan Fees"). As of the Petition Date, the Debtors estimate that they owe approximately $5,000 in Retirement Plan Fees.

**4. Relocation Program.**

49. The Debtors pay for certain expenses to relocate or provide temporary housing for certain Employees (the "Relocation Program"). Specifically, the Relocation Program provides Employees with a relocation allowance, temporary housing, reimbursement for house hunting expenses, and transport of household goods. In the 12 months prior to the Petition Date, the

Debtors spent approximately $400,000 on account of the Relocation Program. As of the Petition Date, the Debtors estimate that the amount of accrued but unpaid obligations under the Relocation Program is approximately $85,000.

**5. Assistance Programs.**

50. The Debtors offer Employees a program that provides them with personal care and support during difficult times such as serious illness, addiction, injury, relationship issues, or death and grief recovery as well as celebratory support for joyous occasions such as a new baby, wedding, or graduation (the "SandRidge CARE Program"). On average, the Debtors spend approximately $300 per month on account of the SandRidge CARE Program.

51. The Debtors also provide the Employees with a confidential counseling and referral service that can assist Employees with a range of personal and health-related problems (the "Employee Assistance Program"). The Employee Assistance Program pairs Employees with masters and doctoral level clinicians, Certified Public Accountants and Certified Financial Planners, and attorneys. The Employee Assistance Program is administered by ComPsych Corporation ("ComPsych"). On average, the Debtors spend approximately $3,500 per quarter to ComPsych on account of the Employee Assistance Program.

52. Full-time Employees are eligible for the Debtors' tuition assistance program, under which the Debtors reimburse eligible expenses for tuition, fees, books, supplies, and coursework relevant to an Employee's current occupation from certain accredited and preferred higher education institutions (the "Tuition Assistance Program"). The Tuition Assistance Program provides reimbursements up to $10,000 per calendar year upon successful completion of a course. Employees who participate in the Tuition Assistance Program are expected to remain with the Debtors for 18 months after receipt of their last reimbursement. In the

12 months before the Petition Date, the Debtors paid approximately $250,000 on account of the Tuition Assistance Program.

53. In the ordinary course of business, the Debtors reimburse Employees for expenses associated with the adoption of a child under the age of 18, or an individual over 18 who is physically or mentally incapable of caring for themselves (the "Adoption Assistance Plan" and, together with the SandRidge CARE Program, the Employee Assistance Program, and the Tuition Assistance Program, the "Assistance Programs"). Under the Adoption Assistance Plan, full-time Employees who have been employed for at least one full year are eligible to receive up to $10,000 per adopted child with a $20,000 maximum lifetime reimbursement. In the 12 months before the Petition Date, the Debtors paid approximately $1,200 on account of the Adoption Assistance Plan.

54. In the 12 months before the Petition Date, the Debtors paid approximately $283,000 on account of the Assistance Programs. As of the Petition Date, the Debtors estimate that the aggregate amount of accrued but unpaid obligations on account of the Assistance Programs is $211,000.

**B. Paid and Unpaid Leave.**

55. The Debtors maintain several paid leave benefit programs for Employees, providing paid leave for PTO, ETO, Holidays, FMLA Leave, Maternity Leave, and Other Paid Leave (each as defined below, and together, the "Paid Leave").

56. In the ordinary course of business, the Debtors provide paid time off ("PTO") to the Employees as a Paid Leave benefit. PTO accrues at a specified rate based on the Employee's years of service and date of hire. Employees may carry over up to a maximum of 80 hours of unused PTO into the next calendar year as extended time off ("ETO"). ETO may be used as a Paid Leave benefit for qualifying absences under the Family and Medical Leave Act

(the "FMLA"). Employees who are terminated or resign are entitled to a cash payment in lieu of the accrued but unused PTO.

57. The Debtors estimate that, as of the Petition Date, the aggregate amount of accrued but unused PTO is approximately $2.4 million. This amount, however, is not a current cash payment obligation except in the event the Employees leave the Debtors' employment.

58. In addition, the Debtors provide certain other forms of Paid Leave and Unpaid Leave, including:

- 10 paid holidays throughout the year, during which Employees are not required to work and are paid their base rate of pay (the "Holidays");
- paid and unpaid leave under the FMLA for: (a) birth, adoption, or foster care, (b) family care, (c) medical emergencies, (d) military exigencies, and (e) military caregiving needs (the "FMLA Leave");
- six weeks paid maternity leave (the "Maternity Leave") for expecting female Employees who are eligible under the FMLA; and
- other paid and unpaid leaves of absence for personal reasons, many of which are required by law, including missed work time in the ordinary course of business for bereavement leave, jury or court attendance, or time spent voting (the "Other Paid Leave") and unpaid leaves of absence for family medical leaves and military leaves (the "Unpaid Leave").

These other forms of Paid Leave and Unpaid Leave do not involve incremental cash outlays beyond standard payroll obligations. The Debtors retain Matrix Absence Management, Inc. to administer Paid Leave and Unpaid Leave programs.

59. The Debtors believe that the continuation of the Paid Leave and Unpaid Leave policies in accordance with prior practice is essential to maintaining Employee morale during these chapter 11 cases. Further, the policies are broad-based programs upon which all Employees have come to depend. The Debtors anticipate that their Employees will utilize any accrued Paid Leave in the ordinary course of business, which will not create any material cash flow requirements beyond the Debtors' normal payroll obligations.

**C. Severance.**

60. In the ordinary course of business, the Debtors have historically provided severance benefits to non-Insider Employees in the event of a termination by the Debtors that is not for "cause," or by reason of death or disability (the "Non-Insider Severance Program"). Under the Non-Insider Severance Program, Employees have generally received, upon termination, four weeks of base pay for each year of service, acceleration of certain equity awards under legacy incentive programs (if applicable), and COBRA benefits equivalent to the number of months of base pay (the "Non-Insider Severance Benefits"). Length of severance is subject to a 13-week minimum, a 26-week maximum, and a 26-week provision for Employees in certain leadership roles. Base pay is an Employee's regular weekly or hourly rate of pay and does not include overtime, incentive compensation, or any other type of compensation.

61. The Debtors believe that the Non-Insider Severance Program has been critical to maintaining Employee morale and loyalty. Increased instability in the Debtors' workforce will only undermine the Debtors' ability to strengthen their financial and operational foundation, to generate growth, and to be positioned for long-term success. As a condition to receiving Non-Insider Severance Benefits, the Debtors typically require that each Employee execute a release agreement, whereby the Employee releases any claims held against the Debtors. The Debtors believe that the Non-Insider Severance Program will help reduce the time and expense that could arise in the absence of the Non-Insider Severance Program to defend the assertion of claims by any severed Employees.

62. In the 12 months before the Petition Date, the Debtors spent approximately $14.6 million on account of the Non-Insider Severance Program. Prior to the Petition Date, the Debtors underwent several reductions in force to adjust their operations to an unfavorable business environment. Waiting periods under applicable law result in a 45-day delay in

payments under the Non-Insider Severance Program. Additionally, the Debtors have already obligated themselves to incur certain Non-Insider Severance Benefits during the pendency of these cases with respect to certain current Employees upon completion of specified projects. As a result, as of the Petition Date, the Debtors estimate that the aggregate amount of accrued but unpaid obligations under the Non-Insider Severance Program is approximately $410,000.

## Basis for Relief

### I. Sufficient Cause Exists to Authorize the Debtors to Honor the Employee Compensation and Benefits.

#### A. Certain Employee Compensation and Benefits Are Entitled to Priority Treatment.

63. Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code entitle certain of the Employee Compensation and Benefits owed to the Employees to priority treatment. Section 507(a)(4) of the Bankruptcy Code requires the Debtors to pay wages, salaries, commissions, vacation, severance, and sick leave as administrative priority claims up to a limit of $12,475 per individual. As priority claims, the Debtors are required to pay these claims in full to confirm a chapter 11 plan. *See* 11 U.S.C. § 1129(a)(9)(B) (requiring payment in full of certain allowed unsecured claims for (a) wages, salaries, or commissions, including severance, and sick leave pay earned by an individual, and (b) contributions to an employee benefit plan). Thus, granting the relief requested herein should only affect the timing of certain payments to the Employees, and should not negatively affect recoveries for general unsecured creditors. Indeed, the Debtors submit that payment of the Employee Compensation and Benefits at this time enhances value for the benefit of all interested parties.

### B. Payment of Certain Employee Compensation and Benefits Is Required by Law.

64. The Debtors seek authority to pay the Withholding Obligations to the appropriate third-party entities. These amounts principally represent Employee earnings that governments, Employees, and judicial authorities have designated for deduction from the Employees' paychecks. Indeed, certain Withholding Obligations are not property of the Debtors' estates because the Debtors have withheld such amounts from the Employees' paychecks on another party's behalf. *See* 11 U.S.C. §§ 541(b)(1), (d). Furthermore, federal and state laws require the Debtors to withhold certain tax payments from the Employees' paychecks and to pay such amounts to the appropriate taxing authority. 26 U.S.C. §§ 6672, 7501(a); *see also City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95–97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes); *In re DuCharmes & Co.*, 852 F.2d 194, 196 (6th Cir. 1988) (noting that individual officers of a company may be held personally liable for failure to pay trust fund taxes); *In re Chabrand*, 301 B.R. 468, 475-81 (Bankr. S.D. Tex. 2003) (same). Because the Withholding Obligations may not be property of the Debtors' estates, the Debtors request that the Court authorize them to transmit the Withholding Obligations on account of the Employees to the proper parties in the ordinary course of business.

65. Similarly, state laws require the Debtors to maintain the Workers' Compensation Program. If the Debtors fail to maintain the Workers' Compensation Program, state laws may prohibit the Debtors from operating in those states. Payment of all Workers' Compensation Program amounts is therefore crucial to the Debtors' continued operations and the success of the Debtors' restructuring.

## II. Payment of the Employee Compensation and Benefits Is Proper Pursuant to Section 363(b) of the Bankruptcy Code and the Doctrine of Necessity.

66. Section 363 of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Courts in the Fifth Circuit have granted a debtor's request to use property of the estate outside of the ordinary course of business pursuant to section 363(b) of the Bankruptcy Code upon a finding that such use is supported by sound business reasons. *See, e.g.*, *Institutional Creditors of Continental Air Lines, Inc. v. Continental Air Lines, Inc. (In re Continental Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or a debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."); *see also In re Crutcher Resources Corp.*, 72 B.R. 628, 631 (Bankr. N.D. Tex. 1987) ("A Bankruptcy Judge has considerable discretion in approving a § 363(b) sale of property of the estate other than in the ordinary course of business, but the movant must articulate some business justification for the sale."); *In re Terrace Gardens Park Partnership*, 96 B.R. 707, 714 (Bankr. W.D. Tex. 1989).

67. Furthermore, section 105(a) of the Bankruptcy Code further provides that a court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code, pursuant to the "doctrine of necessity." 11 U.S.C. § 105(a). The "doctrine of necessity" functions in a chapter 11 case as a mechanism by which the bankruptcy court can exercise its equitable power to allow payment of critical prepetition claims not explicitly authorized by the Bankruptcy Code and further supports the relief requested herein. *See In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (recognizing the "doctrine of necessity"); *see also In re Lehigh & New Eng. Ry.*, 657 F.2d 570, 581 (3d Cir. 1981) (holding

that a court may authorize payment of prepetition claims if such payment is essential to debtor's continued operation); *see also In re Just for Feet, Inc.*, 242 B.R. 821, 824–25 (D. Del. 1999) (holding that section 105(a) of the Bankruptcy Code "provides a statutory basis for payment of pre-petition claims" under the doctrine of necessity); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191–92 (Bankr. D. Del. 1994) (explaining that the doctrine of necessity is the standard in the Third Circuit for enabling a court to authorize the payment of prepetition claims prior to confirmation of a reorganization plan).

68. Moreover, the doctrine of necessity is designed to foster a debtor's rehabilitation, which courts have recognized is "the paramount policy and goal of Chapter 11." *Ionosphere Clubs*, 98 B.R. at 176; *see also In re Quality Interiors, Inc.*, 127 B.R. 391, 396 (Bankr. N.D. Ohio 1991) ("[P]ayment by a debtor-in-possession of pre-petition claims outside of a confirmed plan of reorganization is generally prohibited by the Bankruptcy Code," but "[a] general practice has developed . . . where bankruptcy courts permit the payment of certain pre-petition claims, pursuant to 11 U.S.C. § 105, where the debtor will be unable to reorganize without such payment."); *In re Eagle-Picher Indus., Inc.*, 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) (approving payment of prepetition unsecured claims of toolmakers as "necessary to avert a serious threat to the Chapter 11 process"); *Mich. Bureau of Workers' Disability Comp. v. Chateaugay Corp. (In re Chateaugay Corp.)*, 80 B.R. 279, 285–86 (S.D.N.Y. 1987) (approving lower court order authorizing payment of prepetition wages, salaries, expenses, and benefits).

69. Payment of the Employee Compensation and Benefits is warranted under this authority and the facts of these chapter 11 cases. Employees will be exposed to significant financial difficulties if the Debtors are not permitted to honor obligations for unpaid Employee Compensation and Benefits.

70. Moreover, Employees provide the Debtors with services necessary to conduct the Debtors' businesses, and the Debtors believe that absent the payment of the Employee Compensation and Benefits owed to the Employees, the Debtors may experience Employee turnover and instability at this critical time in these chapter 11 cases. The Debtors believe that without these payments, the Employees may become demoralized and unproductive because of the potential significant financial strain and other hardships the Employees may face. Such Employees may then elect to seek alternative employment opportunities. Additionally, a significant portion of the value of the Debtors' business is tied to their workforce, which cannot be replaced without significant efforts—which efforts may not be successful given the overhang of these chapter 11 cases. Enterprise value may be materially impaired to the detriment of all stakeholders in such a scenario. The Debtors therefore believe that payment of the prepetition obligations with respect to the Employee Compensation and Benefits is a necessary and critical element of the Debtors' efforts to preserve value and will give the Debtors the greatest likelihood of retention of their Employees as the Debtors seek to operate their businesses in these chapter 11 cases.

71. Indeed, bankruptcy courts in the Fifth Circuit have recognized the importance of satisfying employee obligations in cases requesting relief similar to that requested herein. *See, e.g.*, *In re Midstates Petroleum Co.*, No. 16-32237 (DRJ) (Bankr. S.D. Tex. May 2, 2016); *In re Sherwin Alumina Co., LLC*, No. 16-20012 (DRJ) (Bankr. S.D. Tex. Jan. 13, 2016); *In re BPZ Res., Inc.*, No. 15-60016 (DRJ) (Bankr. S.D. Tex. Mar. 10, 2015); *In re Univ. Gen. Health Sys., Inc.*, No. 15-31086 (LZP) (Bankr. S.D. Tex. Mar. 2, 2015); *In re Autoseis, Inc.*, No. 14-20130 (RSS) (Bankr. S.D. Tex. Apr. 25, 2014).[4] Accordingly, the Debtors respectfully

[4] Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

request that the Court authorize the Debtors to pay and continue the Employee Compensation and Benefits in the ordinary course of business and consistent with past practice.

## III. A Limited Waiver of the Automatic Stay for Workers' Compensation Claims Is Appropriate Here.

72. Section 362(a) of the Bankruptcy Code operates to stay "the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title . . . ." 11 U.S.C. § 362(a)(1).

73. Section 362 of the Bankruptcy Code, however, permits a debtor or other parties in interest to request a modification or termination of the automatic stay for "cause." *Id.* at § 362(d)(1). Cause exists here to modify the automatic stay to permit the Employees to proceed with workers' compensation claims in the appropriate judicial or administrative forum. Staying the workers' compensation claims could have a detrimental effect on the financial well-being and morale of the Employees.

## IV. Cause Exists to Authorize the Debtors' Financial Institutions to Honor Checks and Electronic Fund Transfers.

74. The Debtors have sufficient funds to pay the amounts described in this Motion in the ordinary course of business by virtue of expected cash flows from ongoing business operations and anticipated access to cash collateral. In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to an authorized payment in respect of the Employee Compensation and Benefits, as applicable. Accordingly, the Debtors believe that checks or wire transfer requests, other than those relating to authorized payments, will not be honored inadvertently. Therefore, the Debtors respectfully request that the Court authorize and direct all applicable financial institutions, when requested by

the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this Motion.

**Emergency Consideration**

75. The Debtors respectfully request emergency consideration of this Motion pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm." The Debtors' Employees are critical to an immediate and orderly transition into chapter 11, and any disruption in providing the Employee Compensation and Benefits could hinder the Debtors' operations and cause irreparable harm. Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and, therefore, respectfully request that the Court approve the relief requested in this Motion on an emergency basis.

**Waiver of Bankruptcy Rule 6004(a) and 6004(h)**

76. To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

**Reservation of Rights**

77. Nothing contained herein is intended or shall be construed as: (a) an admission as to the amount of, basis for, or validity of any claim against the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's rights to dispute any claim; (c) an assumption, adoption, or rejection of any agreement, contract, or lease under section 365 of the Bankruptcy Code; (d) an admission as to the validity, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property

of the Debtors' estates; or (e) a waiver of any claims or causes of action which may exist against any entity.

**Notice**

78. The Debtors will provide notice of this Motion to: (a) the Office of the U.S. Trustee for the Southern District of Texas; (b) the holders of the 50 largest unsecured claims against the Debtors (on a consolidated basis); (c) the administrative agent under the Debtors' first lien credit facility and counsel thereto; (d) the indenture trustee for the Debtors' second lien notes; (e) the indenture trustee for the Debtors' senior unsecured notes; (f) the indenture trustee for the Debtors' convertible unsecured notes; (g) counsel to the ad hoc groups of holders of claims specified in clauses (d) and (e); (h) the United States Attorney's Office for the Southern District of Texas; (i) the Internal Revenue Service; (j) the United States Securities and Exchange Commission; (k) the Environmental Protection Agency and similar state environmental agencies for states in which the Debtors conduct business; (l) the state attorneys general for states in which the Debtors conduct business; and (m) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

**No Prior Request**

79. No prior request for the relief sought in this Motion has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court enter the Interim Order and Final Order, granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Respectfully Submitted,

Dated: May 16, 2016

*/s/ Zack A. Clement*

Zack A. Clement (Texas Bar No. 04361550)
**ZACK A. CLEMENT PLLC**
3753 Drummond Street
Houston, Texas 77025
Telephone: (832) 274-7629
Email: zack.clement@icloud.com

- and -

James H.M. Sprayregen, P.C. (*pro hac vice* admission pending)
Steven N. Serajeddini (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Email: james.sprayregen@kirkland.com
steven.serajeddini@kirkland.com

- and -

Christopher Marcus, P.C. (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Email: christopher.marcus@kirkland.com

*Proposed Counsel for the*
*Debtors and Debtors in Possession*

**Certificate of Service**

I certify that on May 16, 2016, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Zack A. Clement*
One of Counsel