IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: § | Case Number | |
| § | 16-32488 | |
| SANDRIDGE ENERGY, INC., et al., § | Chapter 11 | |
| Debtor(s). § | (Jointly Administered) | |
| § | | |

### EMERGENCY MOTION FOR AN ORDER DIRECTING THE APPOINTMENT OF AN OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS

TO THE HONORABLE DAVID R. JONES,
UNITED STATES BANKRUPTCY JUDGE:

COMES NOW, Sunil "Neil" Gupta ("Gupta"), Donald Sable II, Frank Tavarez, and Rosalie Wilson, shareholders and interested parties in the above-referenced Chapter 11 case and who have created an Ad Hoc Committee of Shareholders ("Ad Hoc Committee"), and file this Emergency Motion for an Order Directing the Appointment of an Official Committee of Equity Security Holders. The Ad Hoc Committee has reviewed the Disclosure Statement, documents the Debtors claim support the Disclosure Statement, and other documents relevant to the valuation of the Debtors reserves, production, and actions by the officers and directors of the Debtors. This motion incorporates the arguments and evidence included in Gupta's Objection of Shareholder Sunil Gupta to the Disclosure Statement filed on July 7, 2016 [Docket No. 481] as well as the objections raised by the other above-named shareholders [see Docket Nos. 225, 246, 383, 423, 479]. Based on our preliminary review and our own financial valuations, the Ad Hoc Committee seek entry of an order under section 1102(a)(2) of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. ("Bankruptcy Code") and rules 2020 and 9014 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules") directing the United States Trustee for the Southern District of Texas ("U.S. Trustee") to appoint an official committee of equity security holders in the Debtors' chapter 11 cases. In support of this Motion, the Moving Shareholders state as follows:

## I. GROUNDS FOR EMERGENCY

1. The Debtors have filed a plan and Disclosure Statement which provides for complete elimination of all equity interest holders. Despite several letters imploring the U.S Trustee to appoint an equity committee for shareholders, the U.S Trustee informed those shareholders on July 5, 2016 that he would not seek the appointment of such a committee.

2. Two days later, on July 7, 2016, Gupta filed his Objection of Shareholder Sunil Gupta to the Disclosure Statement [Docket No. 481]. Gupta received an informal response by Debtors on Sunday, July 10, 2016 with a proposal to amend the Disclosure Statement. (See Exhibit A.)

3. But the proposed amendment failed to provide the additional specificity sought by Gupta regarding the effect of increased energy prices and on the production revenues. As is evident in their proposed amendment to the Disclosure Statement to address Gupta's objection, the Debtors summarily assert that their Financial Projections and Valuation Analysis are "appropriate," "accurate," "sufficient," and include all assets including "the estimated value of the Debtors' assets in the [Colorado] North Park Basin." (See Exhibit B.) They include no additional specific data to support these assertions. The Debtors also claim that the post-reorganization Incentive Plan is proper and provides no information concerning any bonuses or other special compensation recently given to employees and management. With the one exception clarifying that the Disclosure Statement does not release any claims held by exiting common shareholders (but does not release derivative claims), the Debtors have made no meaningful effort to address Gupta's arguments based on actual data from publicly available sources.

4. Approval of the plan is still on an expedited schedule. The final deadline to object to the disclosure statement was July 13, 2016. A hearing to approve the disclosure statement is set for July 15, 2016 with the anticipated implementation of the reorganization of the Debtors to be completed by August 31, 2016.

5. Gupta and the other Ad Hoc Committee members as well as other shareholders have been diligently and promptly making efforts to investigate the Debtors' true financial status but still have numerous concerns that have not been addressed concerning the current state of the Debtors assets, revenues, and compensation plans. Nevertheless, after consulting with experts in the field, the Ad Hoc Committee has conducted its own valuation of the Debtors assets that indicate a possible valuation range well above the Debtors' estimate.

6. The Ad Hoc Committee's valuations are preliminary and would be enhanced if an Equity Committee were appointed and given the time, information, and resources to further refine and finalize our valuations, especially if there are other assets not accounted for. Despite our diligent and extraordinary efforts, the members of the Ad Hoc Equity Committee are individual investors who do not fully have the means, including discovery, to contest total elimination of their investments. The only way for them to gain adequate representation is for the Court to appoint an official equity holders committee which can represent all of the equity holders.

## I. THE BASIS FOR THE APPOINTMENT OF A SHAREHOLDERS EQUITY COMMITTEE.

7. The Court has the authority to order the appointment of an official committee of equity security holders "if necessary to ensure adequate representation of . . . equity security holders." 11 U.S.C. §1102(a)(2). There is no statutory definition of "adequate representation." As such, courts have developed the following factors that are generally considered in

determining whether an equity committee should be appointed in a given case: (1) the Debtors' solvency; (2) the number of shareholders; (3) the complexity of the case; and (4) whether the cost of the committee significantly outweighs the concern for adequate representation. *See In re Pilgrim's Pride Corp.*, 407 B.R. 211, 216 (Bankr. N.D. Tex. 2009); *In re Wang Labs., Inc.*, 149 B.R. 1, 2 (Bankr. D. Mass 1992).

8. In this case, all of the relevant considerations weigh heavily in favor of ordering the appointment of an official equity committee. The purpose to be served by such an appointment is already manifesting itself in this case where the Debtors have been singularly focused on engaging with creditors and particularly, their senior secured lenders. *See In re Johns-Manville Corp.*, 68 B.R. 155, 160 (S.D.N.Y. 1986) ("One of the purposes of [section 1102] was 'to counteract the natural tendency of a debtor in distress to pacify large creditors, with whom the debtor would expect to do business, at the expense of small and scattered public investors.'") (quoting legislative history).

### A. THE AD HOC COMMITTEE'S PUBLIC MARKET COMPARABLE ANALYSIS DEMONSTRATES THE DEBTORS ARE LIKELY SOLVENT.

9. The Debtors' solvency is a significant factor that supports the appointment of an equity committee in this case. Generally, courts should not disfavor equity unless a debtor is "hopelessly insolvent" or "there is no doubt about the debtor's insolvency." *See Wang*, 149 B.R. at 3; *Pilgrim's Pride*, 407 B.R. at 217 n.15. Value, as reflected in SEC filings and case filings, is sufficient to support a finding of solvency in the context of committee appointment. *See Pilgrim's Pride*, 407 B.R. at 217.

10. Using the data reflected in the Debtors' SEC filings, the Ad Hoc Committee has developed a valuation range for the Debtors' indicated or implied Enterprise Valuation. This analysis makes a public market comparison to other E&P companies using July 2016 reported

market data from two independent industry sources, Credit Suisse and Wells Fargo. This analysis shows a significant likelihood that there is a real potential for meaningful distribution of equity to existing shareholder, despite the Debtors' existing liabilities of over $3.4 billion. (See Exhibit B.)

11. The Ad Hoc Committee obtained July 1, 2016 market valuations by Credit Suisse for 31 competitors in the oil and gas and exploration and production industry indicating their Enterprise values per Boe ("Barrel Oil Equivalent") of proved reserves. These 31 companies were then sorted from lowest to highest value per Boe and divided in four quartiles with their values averaged within each tier. Using the Debtors reports to the SEC concerning their proven reserves reported at 12/31/15 and multiplying that by the averaged implied Enterprise values per Boe for each of the four quartiles, our valuation estimates of the Debtors' reserves range from $2.83 billion, $4.18 billion, $5.85 billion, and as high as $9.85 billion. The latter three estimates, which include almost 75% of the Debtors' competitors (23 of the 31) all establish the Debtors' solvency under today's improved market conditions. (See Exhibit B.)

12. The Ad Hoc Committee also obtained July 8, 2016 market valuations by Wells Fargo for 12 competitors in the oil and gas and exploration and production industry using their Enterprise values per estimated 2016 daily production of Boe ("Barrel Oil Equivalent"). These 12 companies were then sorted from lowest to highest value per Boe and divided in four quartiles with their Enterprise Values per daily production of Boe averaged within each quartile. Using the Debtors reports of their estimated 2016 daily production and multiplying that by the averaged Enterprise Values per estimated 2016 daily production of Boe for each of the four quartiles, our valuation estimates of the Debtors' reserves range from $2.04 billion, $2.71 billion, $3.31 billion, and as high as $4.69 billion. The latter two estimates, which include 50% of the Debtors'

competitors (8 of the 12) all establish the Debtors' solvency under today's improved market conditions. (See Exhibit B.)

13. In contrast, the Debtors' liquidation analysis in pages 5 and 9 of Exhibit F of the Disclosure Statement lists the value of the Debtors' oil and properties as $1.287 billion. This is not substantially different than what the Debtors reported to the SEC in its annual 10-K report for 2015 on page 10 — $1.3 billion, which is intended to represent only the value of the proved oil and gas reserves as of December 31, 2016, using conservative pricing mandated by the SEC and does not include the valuation from unproved reserves, acreage, or other assets[1]:

|  | December 31, | | |
|---|---|---|---|
|  | 2015 | 2014 | 2013 |
| **Estimated Proved Reserves(1)** | | | |
| Developed | | | |
| Oil (MMBbls) | 48.6 | 79.0 | 83.9 |
| NGL (MMBbls) | 51.1 | 56.8 | 35.8 |
| Natural gas (Bcf) | 964.6 | 1,203.4 | 951.6 |
| Total proved developed (MMBoe) | 260.5 | 336.4 | 278.3 |
| Undeveloped | | | |
| Oil (MMBbls) | 29.3 | 47.0 | 58.7 |
| NGL (MMBbls) | 9.9 | 35.0 | 23.3 |
| Natural gas (Bcf) | 149.2 | 584.8 | 438.8 |
| Total proved undeveloped (MMBoe) | 64.1 | 179.5 | 155.1 |
| **Total Proved** | | | |
| Oil (MMBbls) | 77.9 | 126.0 | 142.6 |
| NGL (MMBbls) | 61.0 | 91.8 | 59.1 |
| Natural gas (Bcf) | 1,113.8 | 1,788.2 | 1,390.4 |
| Total proved (MMBoe)(2) | 324.6 | 515.9 | 433.4 |
| PV-10 (in millions)(3) | $ 1,315.0 | $ 5,516.4 | $ 5,191.6 |
| Standardized Measure of Discounted Net Cash Flows (in millions)(2)(4) | $ 1,314.6 | $ 4,087.8 | $ 4,017.6 |

14. In fact, on the same page of this 10-K, Debtors acknowledge that "The PV-10 values shown in the table below are not intended to represent the current market value of the Company's estimated proved reserves as of the dates shown." The Ad Hoc Committee submits that our valuation generates significant concern as to the underestimating of the Debtors' valuation being presented, thereby requiring the appointment of an equity committee.

---

[1] This document is available in full here:
http://investors.sandridgeenergy.com/investor-relations/sec-filings/sec-filings-details/default.aspx?FilingId=11287582

15. It is also important to note that the Ad Hoc Committee's valuation may not include the value of any derivative contracts, real property, equipment, cash flow from operations for 2016, or the further presently intangible value of potential claims of liability against the Debtors officers and directors for breaches of fiduciary duties and/or fraud and negligence.

### B. THERE ARE NUMEROUS SHAREHOLDERS.

16. A member of the Ad Hoc Committee, Donald Sable, has formally requested that the Debtors' provide a list of existing shareholders. The Debtors' received this request one week ago on July 7, 2016, but Mr. Sable has not received a response.

17. In any event, given that there is over 700 million in outstanding shares, it is reasonable to believe that there are thousands of shareholders both across the country and internationally. The court's docket contains hundreds of claims by shareholders and numerous letters objecting to these bankruptcy proceedings.

18. Where shares are widely held, official committee representation is necessary to ensure adequate representation. As courts have explained in the past, even though certain individual shareholders may have the resources to protect their own interests, they do not have a fiduciary duty to represent the interests of the shareholder body as a whole. *See, e.g., In re Beker Indus. Corp.*, 55 B.R. 945, 949 (Bankr. S.D.N.Y. 1985). By contrast, an official committee owes fiduciary duties to its constituency and as such, is needed to ensure the interests of all shareholders are represented where those shareholders are numerous as in this case. Thus, absent the appointment of an official equity committee, the interests of thousands of shareholders will not be adequately represented in these cases because there is no constituency responsible or incented to protect, maintain and maximize the value of equity.

19. An official committee of unsecured creditors has been appointed. But, this body owes fiduciary duties only to unsecured creditors, not the estate as a whole and not to shareholders. Although the interests of unsecured creditors and equity holders might be viewed as aligned to some extent, the interests of the two bodies are often varied and divergent. Of significance, "when it comes to valuation and determination of future capital structure for plan purposes, their agendas are likely to be very much at odds." *Pilgrim's Pride*, 407 B.R. at 217 n. 17. The creditors' committee has no motivation, and indeed may have a disincentive depending on the circumstances, to choose strategic alternatives that maximize value beyond that which goes to their recovery.

20. The Debtors' management likewise cannot adequately protect shareholders' interests in this case. Outside of bankruptcy, the Debtors' management may owe fiduciary duties only to shareholders, but once in bankruptcy, the Debtors' officers and directors have broader fiduciary duties to the estate as a whole, not just equity holders alone. This reality is conducive to conflicting considerations, particularly in a complex case. *See id.* at 218-19 ("The dynamics of a chapter 11 case are such that Debtors – and their management – are likely to be constrained to accept and advocate to the court a conservative value for their business in order to obtain creditor assent to a reorganization plan."). The inability of the Debtors' management to represent the interests of shareholders is even further weakened by the fact that the Debtors will be offered new shares in the reorganized company.

21. As set out above, the Debtors have already acted to restrict shareholders rights, using the bankruptcy process as a means of doing so in order to maintain billions in tax attributes. Shareholder interests cannot continue to be impaired because of the absence of a meaningful voice in these cases.

### C. THERE IS NO DISPUTE CONCERNING THE COMPLEXITY OF THESE CASES.

22. The Debtors manage an energy company with complex operations involving over 4,300 wells, properties totaling nearly 1.5 million acres, and proven reserves of crude oil, natural gas liquids, and natural gas that are indisputably valued well above $1 billion. In less than two month since the Debtors filed their petition, there are over 500 docket entries and the certificate of notice contain well over 100 interested parties. Yet, the Debtors have imposed an accelerated schedule to reorganize the company in approximately 90 days.

23. This case requires the active participation of an equity holders' committee to protect the interests of the shareholder body, especially in the context of negotiating a plan of reorganization. Despite the Debtors' plan to complete their reorganization by the end of August 2016, it would still be timely at this juncture to appoint an official committee to actively participate in the major decisions to be made over the next few weeks in the Debtors' cases.

### D. THE COST OF AN ADDITIONAL COMMITTEE IS DE MINIMIS IN COMPARISON TO THE COMPELLING NEED FOR SHAREHOLDER REPRESENTATION.

24. If circumstances otherwise show that the appointment of an official equity committee is appropriate, as is the case here, the burden then shifts to the opposing party to demonstrate that the costs associated with such appointment "significantly outweigh" the need for shareholder representation. *See Beker*, 55 B.R. at 949 (explaining that once the need for adequate representation is established, the "burden shifts to the opponent of the motion to show that the cost of the additional committee sought significantly outweighs the concern for adequate representation and cannot be alleviated in other ways.").

25. The Ad Hoc Committee is mindful of concerns regarding the additional expense associated with formation of an official equity committee. As a starting point, the Bankruptcy Code provisions already in place for approval of compensation function as safeguards for

controlling costs. *See, e.g.,* 11 U.S.C. §330(a). Additionally, the accelerated pace of these cases means that an equity committee will only have weeks to meaningfully participate in these cases, particularly with the plan process.

26. Given that our estimates posit an equity value to shareholders that could exceed the value of $3.5 billion, it would be tragic to completely leave shareholders out of the negotiating process where so many retirement funds, college funds, and the hard-earned savings of thousands of investors are at stake. Under the circumstances, and in light of the sensitivity to cost expressed above, the benefits of committee representation of shareholders' interests far outweigh any additional costs to the Debtors' estates.

## II. THE INTEGRITY OF THE PROCESS DEMANDS APPOINTMENT OF AN EQUITY COMMITTEE.

27. On the eve of their bankruptcy filings, the Debtors reported to the SEC and announced to the public cancellation of a reverse split to increase the share price was in the interest of stockholders, the purchase of property in Colorado with promising proven reserves, the availability of nearly a half billion dollars in cash, and the comfort that all of its production had been hedged through the end of that year despite declining energy prices in the last quarters of 2015. Where the Debtors have represented time and again that they have the prospect of recovery by shareholders, "[t]he integrity of the process dictates that the estate spend reasonable costs for equity to formally have a negotiating voice." *See In re Amresco, Inc.*, Case No. 01-3527, Bankr. N.D. Tex., Sept. 7, 2001, Findings of Fact and Conclusions of Law, 12. At a minimum, an equity committee is necessary under the circumstances to test "the legitimacy of the outcome of the case"—that is to have a formal voice to assess the legitimacy of potentially eliminating the investments of thousands of public shareholders. *Id.* at 15.

28. To further this point, the Ad Hoc Committee makes the additional observations:

**AN UNNECESSARY BANKRUPTCY STRATEGICALLY PLANNED BY MANAGEMENT**

29. Following the fall in in energy prices, in October 2015, SandRidge announced a special shareholders meeting for November 6, 2016 to approve a reverse split in order to prevent the company's stock from being delisted from the NYSE.[2] But on October 28, 2015, the company cancelled the special meeting stating[3]:

> **Item 8.01.  Other Events.**
>
> SandRidge Energy, Inc. (the "Company") has determined to cancel the Special Meeting of Stockholders previously scheduled on November 6, 2015 (the "Special Meeting") and to delay the consideration of the matters proposed until the Company's 2016 Annual Meeting of Stockholders. The Company scheduled the Special Meeting to consider a proposal to amend the Company's Certificate of Incorporation to effect a reverse stock split for the purpose of increasing the price of the Company's common stock in order to regain compliance with the New York Stock Exchange (the "NYSE") continued listing requirements. To regain compliance with the listing requirement, the Company's common stock must have a closing price of at least $1.00 and an average closing price of at least $1.00 over the 30 trading-day period ending on the last trading day of that month. While the Company intends to regain compliance with the listing requirement, the Board has now determined that it is in the best interests of stockholders to cancel the Special Meeting. To the extent necessary, the Company will seek stockholder approval at its 2016 Annual Meeting of Stockholders with respect to actions it may pursue to regain compliance with the NYSE listing requirement.

30. Instead, SandRidge announced on November 4, 2016 that it had purchased the Rockies property. On a conference call with shareholders the following day, James D. Bennett - President, Chief Executive Officer & Director, stated:

> It's important to note that while we're reducing debt, we have been and will continue to be very protective of the equity and mindful of any dilution. Into year end, we'll continue to assess liability management opportunities. However, during this call, we can't comment on or signal any next steps in that regard.

31. In that same conference call, Julian Mark Bott, Chief Financial Officer & Executive VP, stated:

> With regards to hedging, our mark-to-market position was a positive $119 million as of September 30. For the fourth quarter, all of our production is hedged. Please refer to the derivative contracts table in our earnings release for additional details on our 2015 and 2016 hedging program.

32. Consequently, through the end of 2015, management continued to represent to shareholders that a reverse split was not in the shareholders best interests, that the acquisition of the Colorado Rockies property was beneficial to the company's value, that production was

---

[2] See http://d11ge852tjjqow.cloudfront.net/CIK-0001349436/915df765-5fc0-4191-b226-2283a39ade06.pdf?noexit=true
[3] See http://d11ge852tjjqow.cloudfront.net/CIK-0001349436/2e18a445-1387-4432-9cc9-28b53953f370.pdf?noexit=true

Page 11

hedged through the end of the year (and, therefore, would provide some insulation against actual spot prices that had crashed), and that the company was "protective of the equity."

33. However, by January 6, 2016, management had already entered into an retainer agreement with Kirkland & Ellis, known for their specialization in Chapter 11 reorganizations. (See Debtors' Application for Entry of an Order Authorizing the Retention and Employment of Kirkland & Ellis LLP and Kirkland & Ellis International LLP as Attorneys for the Debtors and Debtors In Possession Effective Nunc Pro Tunc to the Petition Date, Exhibit 1 [Docket No. 186].[4] This suggests that management likely begun seeking assistance in restructuring before the holidays at the end of 2015.

34. Additionally, the 10-Q for the Q1 of 2016 does not explain why there was a significant drop in the Debtors' production. If one compares the production data given on page 55 of the 10-Q for the Q1 of 2016 with the production data for Q4 of 2015 given on page 5 of the 10-K for the Operations and Reports Financial Results for Fourth Quarter and Fiscal Year 2015, we see a 29% drop in production of crude oil, and a 21% drop in the production of natural gas.

35. Finally, it is undisputed that the Debtors came out of Q1 of 2016 with over a half billion dollars in cash. Although energy prices had fallen, the company still had enough cash on hand to continue operations through 2016, yet it chose to file Chapter 11 in May 2016, one month before the regularly scheduled annual shareholders meeting in which management would have to take accountability for any mismanagement and perhaps face removal by vote of the shareholders. As our own valuation illustrates small swings in energy prices can result in huge swings in the value of a company's oil and gas properties. Debtors took full advantage of the

---

[4] See https://cases.primeclerk.com/sandridge/Home-DownloadPDF?id1=MzU5ODEz&id2=0

unusual downturn in energy prices in the Q4 of 2015 and the Q1 of 2016 to write down "on paper" billions of dollars in value in order to justify a Chapter 11 filing.

36. As previously discussed in the Objection of Shareholder Sunil Gupta to the Disclosure Statement, it seems disingenuous and unfair for the Disclosure Statement to create an Incentive Plan to give SandRidge employees and management preferential ownership of the reorganized company's stock while other common shareholders are being shut out. This Incentive Plan clearly makes management and employees self-interested in the approval of the Plan to the clear detriment of the existing common shareholders.

37. In 2005, Congress added Section 503(c)(1) to the Bankruptcy Code in order to stop an abuse in the administration of Chapter 11 cases when insiders received substantial postpetition compensation bonuses. Section 503(c) distinguishes between those employees who are "insiders" and those who are not. Under § 503(c)(1), bonuses offered to retain the employment of insiders are prohibited unless the debtor is able to meet the strict requirements set forth in § 503(c)(1), which include that the employee has a bona fide job offer elsewhere at the same or greater rate of compensation and that the employee's services are essential to the survival of the business. Section 503(c)(3) relaxes those requirements with respect to non-insiders, requiring only that the proposed retention payments be "justified by the facts and circumstances of the case."

38. The Ad Hoc Committee submits that the Incentive Plan described in the Disclosure Statement presents no targets for employees or management to meet in order to earn shares in the reorganized company. What is clear is that management has entered into a quid pro quo with a group of creditors. On the one hand, management receives a rich compensation package and the prospects of running a company with little debt. In return, the Debtors use the

bankruptcy process to convert debt to equity, wipe out shareholders, and enjoy the benefits of equity upside, which will far exceeds amounts owed to creditors. Where, as here, incumbent management and creditors enter into a sweetheart deal which wipes out shareholders (despite earlier contrary assurances by management), it is imperative to ensure that the integrity of the process by the appointment of an equity committee.

### III. RESERVATION OF RIGHTS

39. The Ad Hoc Committee continues to analyze and review the Disclosure Statement and the Plan and reserves all rights in connection with confirmation of the Plan. This motion is submitted without prejudice to, and with a full reservation of, the Committee's rights to supplement or amend this Supplemental Objection in advance of, or in connection with, the hearing to approve the Disclosure Statement and/or confirmation of the Plan. Nothing herein is intended to be a waiver by the Committee of any right, objection, argument, claim, or defense with respect to any matter, including matters involving the Disclosure Statement, the RSA and the Plan, all of which are hereby expressly reserved.

## **CONCLUSION**

For the foregoing reasons, the Ad Hoc Committee requests the appointment of an equity committee.

Respectfully Submitted:

| | |
|---|---|
| Dated: 7/14/2016<br>Sunil "Neil" Gupta<br>Pro Per<br>160 Northridge Dr<br>Daly City, CA 94015<br>Phone: 408-603-4779<br>skgupta24@yahoo.com | _____<br>SUNIL GUPTA |
| Dated: 7/14/2016<br>Donald Sable<br>Pro Per<br>banddsable@aol.com | _____<br>DONALD SABLE |
| Dated: 7/14/2016<br>Frank Tavarez<br>Pro Per<br>tavarezz@hotmail.com | _____<br>FRANK TAVAREZ |
| Dated: 7/14/2016<br>Rosalie Wilson<br>Pro Per<br>rosalie.wilson@earthlink.net | _____<br>ROSALIE WILSON |

**E**XHIBIT **A:**
**D**EBTORS **P**ROPOSED **A**MENDMENT TO THE **D**ISCLOSURE **S**TATEMENT IN **R**ESPONSE TO **G**UPTA'S **O**BJECTION

**Shareholder Disclosure Statement Insert**

Certain SandRidge common stockholders have made the following assertions, among others, each of which the Debtors dispute in all material respects:

- the Chapter 11 Cases were prematurely filed given, among other things, that the Debtors held over $600 million of cash on hand as of the Petition Date;

- the Valuation Analysis significantly undervalues the Debtors' assets, reserves, revenues, and production;

- the Financial Projections should be revised to reflect increases in commodity prices since May 26, 2016, including an asserted $3.06 per barrel oil price increase, $0.26 per thousand cubic feet of natural gas price increase, and a $6.20 per barrel natural gas liquids price increase;

- the Financial Projections should reflect an additional $16.153 million to $32.302 million in revenues;

- the Disclosure Statement insufficiently explains the methodology employed in the Valuation Analysis;

- making the foregoing adjustments would add hundreds of millions of dollars to the estimated value of the Debtors' assets;

- that the Disclosure Statement does not reflect almost $8 million of sales and production figures from the Debtors' assets in the North Park Basin;

- that the Debtors may own certain undisclosed and high-performing wells in the North Park Basin that are not reflected in the Valuation Analysis or certain state or local registries;

- that the Employee Incentive Plan, which will reserve 10 percent of the New Common Stock for distribution to continuing officers, directors, and employees of the Reorganized Debtor, and the releases contained in Article VIII of the Plan, create conflicts of interest between the Debtors' management and SandRidge's common stockholders; and

- the releases contained in Article VIII of the Plan impermissibly fail to allow SandRidge common stockholders to "opt out" of the releases.

The Debtors dispute each of the foregoing assertions in all materials respects. Specifically, the Debtors assert as follows:

- the Debtors' decision to file the Chapter 11 Cases was made in good faith and was a sound exercise of business judgment given, among other things, alleged defaults or events of default under debt documents, the severe decline in commodity prices, and the Debtors' approximately $4.1 billion of funded debt and associated material ongoing interest obligations;

- the Valuation Analysis employs methodologies that are appropriate in light of its purposes, provides an accurate estimate of the value of the Debtors' assets, and is consistent with customary methodologies and industry practice;

- the Financial Projections reflect reasonable projections of commodity prices based on accurate available information and consistent with customary methodologies and industry practice;

- the explanatory materials accompanying the Valuation Analysis contain sufficient description of the customary valuation methodologies utilized by the Debtors, including a net asset value analysis, precedent transactions analysis, comparable company analysis, and standard valuation methodologies for other assets;

- the Financial Projections and Valuation Analysis include the projected revenues from, and estimated value of, all of the Debtors' material assets, including the estimated value of the Debtors' assets in the North Park Basin, which are sufficiently described in the Disclosure Statement;

- the Debtors are in compliance with all applicable well and reserve reporting requirements, including with respect to the North Park Basin and applicable Colorado state and local law, to the extent applicable;

- the Employee Incentive Plan and the releases contained in Article VIII of the Plan are (a) customary, consistent with market practice, and permissible under the Bankruptcy Code and all applicable law, (b) are in the best interests of the Estates, and (c) do not create any conflicts of interest;

- the releases contained in Article VIII.F of the Plan do not purport to release Claims held by SandRidge common stockholders in their capacities as such and therefore no "opt out" from the releases is required for such parties; and

- the Debtors' directors and officers did and continue to discharge their fiduciary duties to the Debtors and the Estates consistent with the Bankruptcy Code and all applicable law and have at all times acted free of any conflicts of interest, on an informed basis, in good faith, and in the best interests of the Debtors and the Estates.

The Debtors dispute, and reserve all rights with respect to, the assertions of such objecting SandRidge common stockholders with respect to the Plan, the Disclosure Statement, the Financial Projections, and the Valuation Analysis.

# EXHIBIT B:
## AD HOC COMMITTEE'S VALUATION ANALYSIS & SUPPORTING DOCUMENTS

FILED SEPARATELY ELECTRONICALLY

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing pleading was served by electronic mail via the Court's ECF filing system to all parties authorized to receive electronic notice in this case as of July 14, 2016.

_____
SUNIL GUPTA